

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - X
IN THE MATTER OF THE APPLICATION         :    TO BE FILED
OF THE UNITED STATES OF AMERICA          :    UNDER SEAL
FOR A SEARCH WARRANT FOR THE             :
PREMISES KNOWN AND DESCRIBED AS:         :    AFFIDAVIT IN SUPPORT
95-09 JAMAICA AVENUE, 1R                 :    OF APPLICATION
WOODHAVEN, NEW YORK AND CLOSED           :    FOR SEARCH WARRANT
CONTAINERS AND CLOSED ITEMS              :
CONTAINED THEREIN                        :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK          )
COUNTY OF KINGS            ) ss.:
EASTERN DISTRICT OF NEW YORK )
```

JOSEPH KALETA, being duly sworn, deposes and says:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been a Special Agent for approximately three years. Since becoming a Special Agent with the DEA, I have participated in numerous investigations of unlawful drug distribution and conspiracy to do the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and confidential informants, the execution of search warrants, the debriefings of informants and other witnesses, and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs.

2. I respectfully submit this affidavit on behalf of the Government pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of an application by the United States for the issuance of a warrant to search the premises known and described as: 95-09 JAMAICA AVENUE, 1R, WOODHAVEN, NEW YORK, AND CLOSED CONTAINERS AND ITEMS CONTAINED THEREIN (the "PREMISES"). For the reasons set forth below, I believe there is probable cause to believe that the PREMISES contains evidence of violations of the federal laws prohibiting the distribution of controlled substances and conspiracy to do the same, that is, 21 U.S.C. §§ 841(a)(1) and 846.

3. The information contained in this affidavit is based upon my own knowledge as well as information obtained from

other sources, including: (a) statements made to me by other law enforcement agents who have participated in this investigation; (b) statements made by non-law enforcement witnesses; (c) my review of records and documents provided by other law enforcement agencies and other entities; and (d) my review of court-authorized interceptions of wire communications and transcripts and summaries of such interceptions. Where the statements of others or information from documentary records are related herein, they are related in substance and in part and not verbatim. Since this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not set forth each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search warrant sought herein.

I. **Background**

4. Earlier this year, I learned from a cooperating witness (the "CW") who has been corroborated by recordings and wire tap recordings as described below that Wilfredo Salas and others were engaged in the distribution of cocaine and cocaine base ("crack") in New York City. Under the direction of the DEA, during late February 2007, the CW engaged in several recorded telephone conversations with Salas, which eventually set up a meeting with Salas on or about February 27, 2007, which the CW surreptitiously recorded under the direction of the DEA. Based on my later debriefing of the CW and on my review of the recording, I learned that during this meeting:

    a. Salas advised the CW that he was looking for a cocaine supplier on behalf of his cousin. Salas stated that his cousin and his brother were trafficking in large amounts of cocaine — "5 or 6 keys"[1] at a time — and that they had been supplied by a Colombian source, but that their operation slowed down dramatically when Salas' brother was arrested.

    b. Salas stated that his cousin was trying to rebuild his narcotics business and was having problems because his present suppliers were inconsistent. Salas was looking for a supplier who was reliable and who could supply kilogram quantities of cocaine for "19 and a half to 20" for each kilogram (based on my experience and training, I know that $19,000 to

---

[1] Words that are quoted in this Affidavit are based on preliminary review of recordings and/or draft transcripts or line sheets of recordings and may be subject to further revision.

$20,000 falls within the range of typical wholesale prices for a kilogram of cocaine). Salas asked the CW whether the CW could do so.

  c. Salas stated that his cousin is trying to "cook" a "brick" (which, based on my experience and training, I believe referred to one kilogram) of cocaine into crack. He also stated that his cousin has a lot of "projects" happening and has a lot of "people" working for him, which, based on my experience and training, I believe meant that Salas' cousin has many individuals working for his narcotics organization.

  5. Based in part on information obtained through the use of the CW, beginning in or about April 2007, the DEA received court-authorization from the United States District Court in the Southern District of New York to intercept wire communications occurring over a cellular telephone used by Wilfredo Salas. The intercepted calls, combined with physical surveillance, confirmed that Salas was engaged in the distribution of controlled substances and that the PREMISES — where, according to Department of Motor Vehicles records, Salas resides and where agents conducting surveillance have seen him come and go on numerous occasions — likely contain evidence of Salas' narcotics operation, including drug related records and narcotics. For instance:

  a. On or about Friday, April 13, 2007, at approximately 8:53 a.m., Salas called his cousin Phillip Casanova in anticipation of getting drugs from Casanova for distribution to their clients. Specifically, Salas told Casanova, "I passed by your house. . . . You know, I'll pick them [the drugs] up, take them to my house, you know that shit, bro." In response, Casanova advised Salas that he was having some difficulty with getting drugs, but expected some that day: "I ain't really want to talk about it [the drugs] 'cause every time I talk about it, the shit don't come but . . . maybe, maybe be popping today. The kid, this nigga [unintelligible] was telling me, and he told me that shit on, on Wednesday, it was like 'On Friday. Friday, son, is supposed to drop something, so let's see what's good, man.'" Salas replied, "All right, no doubt. I got a little list [of drug customers] for you right now so, yo, when I come out of work, I'll go talk to you personally, you know what I mean? I don't want to talk too much over the phone. I got a little list anyway, so I'll give you a holler when I get off work to see you around." (Session 295) (emphasis added)

  b. Later, on or about April 13, 2007, at approximately 3:43 p.m., Salas called an unknown male (the "UM")

-3-

and advised the UM that he had just returned from Puerto Rico. Salas then went on to comment that he was expecting a shipment of drugs that night (i.e., "Right now, I'm waiting for shit coming through tonight. . . .Shit's going to be poppin again."). Significantly, he also stated that he had a list of drug customers: "I got a little list right now for everybody. Everybody's asking for shit [drugs] so when tonight come[s] through, I gotta start calling people and get what they need." (Session 299)

    c.    On or about April 25, 2007, at approximately 7:48 p.m., Salas received a call from a customer (the "Customer"). During this call, they agreed to meet at around 9:00 p.m. (Session 574) At approximately 8:38 p.m., Salas called the Customer and the two agreed to meet on "the spot" on "Main Street" where they met before. The Customer then asked, "How much is a Big Boy?" to which Salas, replied, "Uh, the Eight?" The Customer answered in the affirmative, and Salas explained, "right now is expensive. . .right now, the shit I'm getting is very expensive." The Customer replied, "Just tell me what you need," and Salas responded, "I give you the same price. . .140." Salas then stated that he was going to be "there" at 9:00 p.m. (Session 576)

    d.    Agents conducting surveillance of Salas that evening observed him leaving the PREMISES shortly after the time of this call and drive to the vicinity of Main Street and the Long Island Expressway in Queens. At approximately 8:50 p.m., the agents saw Salas park behind a Dodge that was already there, saw Salas get out of his car and into the Dodge, and saw Salas leave shortly thereafter and drive away in his car. Based on my experience, training, and investigation of this matter (including the calls described above), I believe that Salas just delivered an "eight-ball" (i.e., an eighth of an ounce) of cocaine to the Customer, which he got from the PREMISES.

    e.    On or about May 3, 2007, at approximately 8:26 p.m., Salas called an unidentified male (the "UM") and asked the UM to "Come see me." In response, the UM stated, "I'll hit you up. How much I owed you? 15? No." Salas replied, "No, you owed, I think, 40." The UM protested, "No, no, it was 30, it was 30." Salas apparently accepted this figure and then cited a "list" that he kept in his house: "Oh! Thirty. I still has [unintelligible]. *In my house, I got a list of people who owe me money*. Listen, listen, come through, my man, you know what I mean? At least I be fair to you, at least be fair with me." (Emphasis added) The UM then stated that "I get some [unintelligible] today. I'm going to hit you up. Maybe you

-4-

could stop by here?" (Session 610) Based on my experience, training, and investigation of this matter, I believe that the "list" in his "house" to which Salas referred was a drug ledger of customers.

6. In addition to the evidence described above, on or about June 4, 2007, the Customer was approached by DEA agents and began cooperating with the agents. Under the DEA's direction, the Customer called Salas and ordered a quantity of cocaine. Salas agreed to deliver the cocaine to the Customer later that afternoon.

## II. Description Of The PREMISES

7. Other agents and I have conducted surveillance of the PREMISES. Based on my observations and on my conversations with other agents, I know that the PREMISES is located in the rear of a large mixed-use building located at 95-09 Jamaica Avenue in Woodhaven, New York. The front of the building facing the street is principally occupied by commercial store fronts. In order to access the PREMISES, one must walk down a short alley toward the rear of the building that opens into a courtyard. Various apartment doors are accessible directly from the courtyard, and the PREMISES is one of them. The door to the PREMISES is white and is clearly and prominently marked with the designation "1R." As noted above, other agents and I have observed Wilfredo Salas enter and exit the PREMISES on numerous occasions.

## III. Probable Cause To Search the PREMISES

8. Based on my experience and training, I know that narcotics traffickers often engage in their business on a consignment and credit basis, and, therefore, maintain detailed records of their illicit business such as lists of supplier, customer lists, and accounts ledgers listing outstanding debts and debtors. These records are usually maintained in an accessible yet hidden location, and — like the records of any active business — kept for long periods of time. Indeed, with the increasingly common use of computers, I know that drug dealers often keep detailed records of their illegal activities in electronic form on an indefinite basis, on devices such as computers and/or personal data accessories ("PDAs"), as well as on portable electronic storage media such as memory cards or compact disks.

9. In addition, based on my experience and training, I know that locations in which narcotics have been stored often

contain chemical traces of the narcotics even after the narcotics have been long removed. Such traces are detectable for long periods of time through the use of scientific tests such as an "ion scan," which uses a vacuum to gather particles from areas in which narcotics are suspected of being stored, and then subjecting the collected particles to chemical analysis.

10. Accordingly, for the reasons set forth above, I believe that there is probable cause to believe that the **PREMISES** presently contains evidence of narcotics distribution and conspiracy to do the same, including, for example, narcotics, narcotics packaging material, records related to narcotics trafficking (including records stored on computers and other electronic devices), chemical traces evincing the past presence of narcotics, and other evidence of the trafficking of narcotics, as described in greater detail in Attachment A hereto.

11. Moreover, in order to ascertain the identity of who controls the **PREMISES** and any evidence found therein, leases, rental agreements, contracts, mortgages, and other documents indicating ownership, possession, and/or control of the **PREMISES** would also be important evidence in this case.

12. Furthermore, based upon my training and experience I also know that individuals involved in the illicit activities described herein frequently maintain custody of the items described above within closed and/or locked cabinets, briefcases, storage lockers, safes, and other containers kept within their places of business. I would therefore ask authorization to open any closed items and containers or to seize any such closed items and containers so that they may be opened if tools or other implements are required.

13. Based upon the foregoing, I respectfully submit that there is probable cause to believe that there is currently contained within the **PREMISES** the items described generally above, and set forth with greater specificity in Attachment A to this Affidavit. Moreover, there is probable cause to believe that these items constitute evidence of the distribution of narcotics and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## Conclusion

14. Based upon the foregoing, I respectfully request that a warrant be issued for the search of the premises known and described as: 95-09 JAMAICA AVENUE, 1R, WOODHAVEN, NEW YORK, AND CLOSED CONTAINERS AND ITEMS CONTAINED THEREIN.

JOSEPH KALETA
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this 4th day of June, 2007.

THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

sw.frm (Rev. EDNY 1996) Search Warrant

# United States District Court

_____EASTERN_____ DISTRICT OF _____NEW YORK_____

In the Matter of the Search of

THE PREMISES KNOWN AND DESCRIBED AS 95-09
JAMAICA AVENUE, 1R, WOODHAVEN, NEW YORK,
AND CLOSED CONTAINERS AND ITEMS CONTAINED
THEREIN

**SEARCH WARRANT**
CASE NUMBER:

**07   670 M**

TO: Special Agent Joseph Kaleta, DEA _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____Special Agent Joseph Kaleta, DEA_____ who has reason to
                                                            Affiant
believe that [ ] on the person of [✓] on the premises known as

95-09 JAMAICA AVENUE, 1R, WOODHAVEN, NEW YORK, AND CLOSED CONTAINERS AND
ITEMS CONTAINED THEREIN

In the _____EASTERN_____ District of _____NEW YORK_____ there is now
concealed a certain person or property, namely (describe the person or property) See Attachment A

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before June 14, 2007
                                                            Date
(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search in the daytime - 6:00 A.M. to 10:00 P.M. and if the person or property be found there to
seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written
inventory of the person or property seized and promptly return this warrant to __DUTY MAGISTRATE__ As required
by law.                                                                            United States Judge or Magistrate

June 4, 2007  3:31 pm         at   Brooklyn, New York
Date and Time Issued                City and State
The Honorable James Orenstein, United States Magistrate Judge
Name and Title of Judicial Officer          Signature of Judicial Officer

Attachment A

Items to be searched, located, and seized from the premises known and described as: 95-09 JAMAICA AVENUE, 1R, WOODHAVEN, NEW YORK, AND CLOSED CONTAINERS AND ITEMS CONTAINED THEREIN:

1. Narcotics and items used in the distribution of narcotics, including packaging material, substances used to dilute (or "cut") narcotics, scales to weigh narcotics, and presses and other devices used to shape and form narcotics for distribution;

2. Documents relating to or memorializing the distribution of narcotics, including U.S. currency used in the purchase and sale of narcotics, buyer lists, seller lists, pay-owe sheets, and records of sales, log books, ledgers, personal telephone/address books, and/or Rolodexes containing the names and addresses and telephone numbers of persons who are associated with the trafficking of narcotics, and computers, electronic devices, and electronic media on which the information described in this paragraph can be stored in electronic form;

3. Proceeds and articles of personal property which are the fruits, instrumentalities, and evidence of the distribution of narcotics, including U.S. currency, negotiable instruments and financial instruments including stocks and bonds, as well as valuable collectible articles;

4. Indicia of occupancy, residency, and/or ownership of the premises to be searched and other premises;

5. Fibers, particles, and other items that may be subjected to chemical analysis to determine the presence of narcotics; and

6. Any other items containing or reflecting evidence of violations of the federal law prohibiting the distribution of narcotics and conspiracy to do the same, Title 21, United States Code, Sections 841(a)(1) and 846.