UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA        :

            - v. -              :        S1 07 Cr. 557 (JGK)

WILFREDO SALAS,                 :

            Defendant.          :

------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## THE DEFENDANT'S PRE-TRIAL MOTIONS

The Government respectfully submits this memorandum of law in opposition to defendant Wilfredo Salas's pre-trial motions seeking (I) suppression of the wiretap evidence and a <u>Franks</u> hearing; (II) suppression of the evidence obtained pursuant to a search warrant; (III) a bill of particulars; (IV) suppression of his post-arrest statement; and (V) dismissal of the Indictment as void for duplicity.

As set forth below, the defendant's motions should be denied in all respects.

## BACKGROUND

Indictment S1 07 Cr. 557 (JGK) charges the defendant Wilfredo Salas ("Salas") and two other defendants, Phillip Casanova and Efrain Torres, with conspiring from at least in or about early 2007, up to and including on or about June 4, 2007, with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, in a form commonly known as "crack," in

violation of Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A).

As set forth in the Criminal Complaint filed in this matter, which is attached as Exhibit A hereto, Salas's offense conduct may be described as follows.

A. **The Cooperating Witness**

An individual who has pled guilty to federal narcotics crimes and who is cooperating with the Government in the hope of receiving leniency at sentencing (the "CW") advised the Government that the CW used to be a wholesale supplier of cocaine to various retail distributors in New York City and as a result, became acquainted several years ago with a retail distributor named "Pito," later identified to be the defendant Wilfredo Salas through a photo identification by the CW. The CW advised that "Pito", or Salas, worked for a cocaine and crack distribution organization that included his brother, later identified as Michael Salas, and a cousin, later identified as the defendant Phillip Casanova. The CW further advised that this organization typically engaged in transactions involving more than 5 kilograms of cocaine. In addition, the CW advised, the organization "cooked" cocaine into cocaine base for distribution.

B. **The CW's February 2007 Meeting With Salas**

At some point in or about 2007, Salas approached the CW and asked the CW to supply him with cocaine. Under the direction

of the DEA, the CW arranged to meet with Salas in Queens on or about February 27, 2007, in order to discuss engaging in a narcotics transaction.  At this meeting, which was recorded, Salas advised the CW that he was looking for a cocaine supplier on behalf of his cousin (the defendant Casanova).  Salas stated that his cousin and his brother were trafficking in large amounts of cocaine — "5 or 6 keys" (kilograms) at a time — and that they had been supplied by a Colombian source, but their operation slowed down dramatically when Salas's brother, Michael Salas, had been arrested.

During this recorded meeting, Salas further stated that his cousin Casanova was now trying to rebuild his narcotics business and was having problems because his present suppliers were inconsistent.  Salas stated that he was looking for a supplier who is reliable and who can supply kilogram quantities of cocaine for "19 and a half to 20" for each kilogram, that is, $19,500 to $20,000 per kilogram.  Salas asked the CW whether the CW could do so.

Salas further stated that his cousin (Casanova) was trying to "cook" a "brick" (or kilogram) of cocaine into crack. Salas also stated that his cousin has a lot of "projects" happening and has a lot of "people" working for him in his narcotics dealing operation.

C.    **Title III Intercepts**

Based on this and other evidence, on April 4, 2007 and April 26, 2007, the Government sought and received court authorization to intercept wire communications occurring over cellphones used by Salas ("the Salas Cellphone") and Casanova ("the Casanova Cellphone") respectively.  Over the next several weeks, numerous calls relating to narcotics trafficking were intercepted, including the following:

On or about April 17, 2007, at approximately 8:23 pm, Salas received a call from an unidentified male ("UM1").  During this call, Salas asked the UM1, "Yo, what's up, you can't do better than that?"  In response, UM1 stated, "Look, I wish I could, man, you know what I'm saying?  I ain't trying to get over on nobody."  UM1 then advised Salas, "My man just called me, my man that I usually, I always see like once a week, that nigga just called me, yo, I'll pay you at thirty.  Shit is rough, dog, it is rough, you know what I'm saying?"  In response, Salas stated, "No, I can get it, I can get a better price.  You are asking for too much."  UM1 then asked, "How much had I told you, like two-seven?" and Salas replied, "No! . . . .You said two-six. . . .I thought you can do better than that."  UM1 responded, "Shit is just fucked up," and Salas replied, "Oh, I'm just gonna wait for my boy, my other man, he can give me a better price. . . .I thought you could do better, that's why I was

4

calling you, that's why. . . .I'm moving bigger than anything,
I'm moving like a half.  You know what I mean?"  Salas then
asked, "So if I move a half, they got to do better, you know what
I mean?" and UM1 replied, "Yeah, yeah.  I don't even have that."
Salas then declared, "I need more than a half, you know what I
mean?"  He later explained that "Fuck, I got like five people
right now that want shit. . . .For that price moving a half, you
know that's too much."  Salas eventually told UM1, "You were
throwing me what?  Twenty-two? . . . .Listen, hit me as soon as
you get that number.  You drop it like that, hit me."  UM1
agreed.  (Session 363).  During this call, Salas was trying to
buy drugs from the UM1, but balked because UM1's price — $26 per
gram — was too high.  Notably, Salas stated that he was moving
more than "half," by which he appears to have meant "half" a
kilogram of cocaine, and he was seeking a bulk discount.  In the
end, Salas and UM1 agreed to do business if UM1 could lower his
price to "twenty-two," i.e., $22 per gram.

On or about April 20, 2007, at approximately 6:36 pm,
Salas called Casanova, and during this call, Salas asked Casanova
whether he had seen "Julio" and whether Julio said that he had
"no more of that shit?"  In response, Casanova stated that Julio
told him, "'I might be able to get you something, but you have to
come up with the bread. You have to bring it though.  You are not
going to take my cash.'"  Casanova then added that he was not

waiting on Julio and that he was waiting on two other people. Salas then asked, "What number [i.e., price] he told you?" and Casanova replied, "he was like 26, 27." Salas quipped in response, "Damn! That nigga is — wow that is crazy, my man. That is a lot of money!" (Session 471). During this call, Casanova was telling Salas about a possible source of cocaine, "Julio." However, because Julio was demanding at high price — "26, 27," that is, $26 or $27 per gram, which is at the upper end of the wholesale price of a gram of cocaine — Casanova indicated that he was waiting to hear back from two other suppliers instead of Julio.

On or about April 26, 2007, at approximately 1:27 pm, Salas called another unidentified male ("UM2"), and during this call, Salas asked UM2, "How's that shit? It's good, right? It's okay right?" After UM2 replied, "It was decent," Salas explained: "I am asking everybody [i.e., Salas's customers] because I started grabbing shit from somebody else and I wanted to make sure that everybody is okay with what I got right now, you know what I mean?" UM2 again stated that, "It's decent, trust me," and joked, "They can't complain, they can't complain. If they complain [it's] because they need to shoot it up the arm." (Session 587). During this conversation, Salas was checking with UM2, a drug customer, to see if the quality of drugs that Salas provided to UM2 was acceptable.

6

D.    **Salas's Cocaine Sales To Customers 1 and 2**

Based on other intercepted calls, DEA agents identified two particular customers of Salas ("Customer 1" and "Customer 2").  First, on or about May 3, 2007, DEA agents followed Salas as he drove to Manhattan from Queens, entered an apartment building, and met with Customer 1.  After Salas left, DEA agents interviewed Customer 1, who admitted that Salas had just sold him/her a quantity of cocaine.  Customer 1 surrendered the cocaine to the DEA agents.

Second, on or about June 4, 2007, DEA agents interviewed Customer 2, who admitted that s/he had been purchasing cocaine regularly from Salas for approximately six months.  Under the direction of the DEA, Customer 2 called Salas and ordered a quantity of cocaine.  When Salas arrived to meet Customer 2, other agents arrested him and found on him, among other things, a quantity of a white, powdery substance that field tested positive as cocaine.

E.    **The Search of Salas's Apartment And Salas's Arrest**

On June 4, 2007, the Government sought and obtained permission to search Salas's apartment.  When they executed the search, DEA agents found a scale and small plastic baggies consistent with those used to weigh and package drugs.

Also on June 4, 2007, Salas was arrested.  Salas was provided his Miranda warnings in the presence of two DEA agents.

7

Salas waived his <u>Miranda</u> rights and agreed to answer questions without an attorney present.  Salas was initially questioned regarding cocaine found in his shoe following a search incident to his arrest.  In substance and in part, Salas admitted that the substance was cocaine.  Salas further stated that he purchased cocaine for his own consumption and sometimes shared drugs with his friends, but that he did not consider such sharing to be distribution because he (Salas) was not making a profit.  Salas further admitted that he used the scale and bags that were found in his apartment to weigh and store cocaine, though he stated that this cocaine was only for his personal use.

**<u>ARGUMENT</u>**

On May 23, 2008, through his counsel Avrom Robin, Esq., Salas moved for (I) suppression of the wiretap evidence and a <u>Franks</u> hearing; (II) suppression of the evidence obtained pursuant to a search warrant; (III) a bill of particulars; and (IV) suppression of his post-arrest statement.  <u>See</u> Notice of Motion, May 23, 2008 ("Notice of Motion"); Memorandum of Law In Support of Defendant Wilfredo Salas's Motion To Suppress All Wiretap Evidence And Any Fruits Obtained Thereof, May 23, 2008 ("Salas Mem.").

In addition, on December 6 and 10, 2007, in <u>pro</u> <u>se</u> papers, Salas moved for a bill of particulars and to dismiss the Indictment as void for duplicity.

8

As set forth below, the defendant's motions are without merit and should be denied.

## I.    Salas's Motion To Suppress The Wiretap Evidence And For A **<u>Franks</u>** Hearing Should Be Denied

On April 4, 2007 the Government submitted an affidavit by DEA Special Agent Joseph Kaleta ("Kaleta Aff.", attached hereto as Exhibit B) in support of its application to intercept the Salas Cellphone (347-776-2357); the application was granted in an April 4, 2007 Order signed by the Honorable Kimba M. Wood.

On April 26, 2007, the Government submitted an affidavit by DEA Special Agent Matthew J. Daly ("Daly Aff.", attached hereto as Exhibit C) in support of its application to intercept the Casanova Cellphone (347-472-8016); the application was granted in an April 26, 2007 Order signed by the Honorable Thomas P. Griesa.

Salas moves to suppress recordings of telephone calls made pursuant to these orders on grounds that the probable cause, necessity, and minimization requirements were not met in the Government's applications for these Orders. Salas further seeks a <u>Franks</u> hearing concerning purported false statements and omissions in the Government's wiretap affidavits. For the reasons discussed below, Salas's arguments are without merit, and the motion should be denied.

A.    **There Was Probable Cause To Support Both Wiretap Applications**

    1.    Applicable Law

    Title 18, United States Code, Section 2518 sets out the procedures governing the interception of oral communications. Section 2518(3) requires a probable cause determination on three issues: that an individual is committing, has committed, or is about to commit an enumerated offense; that particular communications concerning that offense will be obtained through the requested interception; and that the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3).  See United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999); United States v. Wagner, 989 F.2d 69, 71 (2d Cir. 1993); United States v. Ambrosio, 898 F. Supp. 177, 181 (S.D.N.Y. 1995).

    The Second Circuit has stated that the test for determining probable cause under 18 U.S.C. § 2518 is the same as that for determining probable cause for a search warrant.  Diaz, 176 F.3d at 110 (citing United States v. Fury, 554 F.2d 522, 530 (2d Cir. 1977)).  In Illinois v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court set forth a "totality of the circumstances" test for determining probable cause to support a search warrant. The Court indicated that a judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including

10

the 'veracity' and 'basis of knowledge' of persons supplying
hearsay information, there is fair probability that . . .
evidence of a crime will be found." Id. Moreover, "[p]robable
cause is not an especially demanding standard in this context.
'Only the probability, and not the prima facie showing, of
criminal activity is the standard of probable cause.'" United
States v. Bellomo, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting
Gates, 462 U.S. at 235). See also Wagner, 989 F.2d at 72; United
States v. Labate, 00 Cr. 632 (WHP), 2001 WL 533714, at *16
(S.D.N.Y. May 18, 2001) ("A finding of probable cause requires
only a probability and not a prima facie showing of criminal
activity.") (quotation omitted); United States v. Ruggiero, 824
F. Supp. 379, 398 (S.D.N.Y. 1993), aff'd, 44 F.3d 1102 (2d Cir.
1995) ("Probable cause to issue a wiretap order exists when the
facts made known to the issuing court are sufficient to warrant a
prudent man in believing that evidence of a crime could be
obtained through the use of electronic surveillance.") (quotation
and footnote omitted).

        In assessing probable cause, a wiretap affidavit must
be read as a whole and in a common-sense manner. Defendants may
not "dissect each piece of information in the [agent's] affidavit
to show that each fact taken alone does not establish probable
cause." United States v. Gangi, 33 F. Supp. 2d 303, 306
(S.D.N.Y. 1999), see also Ruggiero, 824 F. Supp. at 399 (a

wiretap affidavit "must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated"); United States v. Scala, 388 F. Supp. 2d 396, 402 (S.D.N.Y. 2005) ("[A] court must look at the government's support for probable cause as a whole.  In other words, a court must look at the snowball, not the individual snowflakes.").

A reviewing court must accord great deference to the prior findings of an issuing judicial officer that probable cause exists.  See Wagner, 989 F.2d at 72 ("substantial deference" owed to finding of an issuing judicial officer that probable cause exists in a wiretap case); United States v. Santiago, 185 F. Supp. 2d 287, 288 (S.D.N.Y. 2002) (same); Gangi, 33 F. Supp. 2d at 306 ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'") (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). The subsequent court's review is limited to whether the issuing judicial officer had a "substantial basis" for the finding of probable cause.  See, e.g., Gates, 462 U.S. at 236; Wagner, 989 F.2d at 72-74; Santiago, 185 F. Supp. 2d at 288.  Thus, "wiretap orders are entitled to a presumption of validity."  Ambrosio, 898 F. Supp. at 181 (citing Fury, 554 F.2d at 530).  Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization.  See Labate, 2001 WL 533714 at *16; Gangi, 33 F. Supp. 2d at 306; Ambrosio, 898 F. Supp. at 181.

2.   Discussion

a.   The Kaleta Affidavit

Contrary to Salas's contention, the Kaleta Affidavit set forth ample probable cause justifying the interception of Salas's cellphone.  When she signed the August 4, 2007 Order authorizing interception of the Salas Cellphone, Chief Judge Wood had a substantial basis, considering the Affidavit as a whole, to find probable cause for the wiretap.

Specifically, in his affidavit, Agent Kaleta recounted that the factual basis for his affidavit was premised on numerous sources, including the statements of a cooperating witness ("CW") (Kaleta Aff. ¶15).  As described in paragraph 15 of the Kaleta Affidavit, the CW advised the DEA

- that the CW used to be a wholesale supplier of cocaine to various retail distributors in New York City and as a result, became acquainted with a retail distributor named "Pito" a number of years ago.

- Although the CW did not deal in narcotics with "Pito," the two are friendly and freely discuss their respective narcotics businesses with each other.

- "Pito" generally sold cocaine and crack for a narcotics distribution organization operated by his brother, who engaged in individual transactions involving more than 5 kilograms of cocaine.

- "Pito"'s brother, in turn, was supplied by and answered to their cousin.

- The family's narcotics operation at one point was supplied by a Colombian source.  In addition, the

organization also "cooked" cocaine into crack for distribution.

- • "Pito" presently uses the Salas Cellphone for his narcotics activities.

- • "Pito" recently has been asking the CW to supply him with cocaine.

The Kaleta Affidavit further describes that, after the CW provided this information to the DEA, the CW made several consensually-recorded conversations with Salas, who used the Salas Cellphone for these calls.  Kaleta Aff. ¶ 16.  As described in paragraph 16 of the Kaleta Affidavit,

  a. On or about February 22, 2007, the CW called "Pito" on the Salas Cellphone and the two agreed to meet in the near future.

  b. On or about February 26, 2007, the CW called "Pito" on the Salas Cellphone and the two agreed to meet the following day to discuss business, i.e., narcotics trafficking.

  c. On or about February 27, 2007, the CW called "Pito" on the Salas Cellphone three times and eventually arranged a meeting with "Pito."

Kaleta Aff. ¶ 16.  The Kaleta Affidavit further described a consensually-recorded meeting between Salas and the CW on February 27, 2007 as follows:

  a. "Pito," while recounting a past conversation he had with another drug dealer, referred to himself as "Wil."

  b. "Pito" advised the CW that he was looking for a cocaine supplier on behalf of his cousin.  "Pito" stated that his cousin and his brother were trafficking in large amounts of cocaine — "5 or 6 keys" at a time — and that they had been supplied

14

by a Colombian source, but that their operation slowed down dramatically when "Pito"'s brother was arrested.

c.    "Pito" stated that his cousin is now trying to rebuild his narcotics business and is having problems because his present suppliers are inconsistent. "Pito" is looking for a supplier who is reliable and who can supply kilogram quantities of cocaine for "19 and a half to 20" thousand dollars for each kilogram, which is within the range of typical wholesale prices for a kilogram of cocaine. "Pito" asked the CW whether the CW could do so.

d.    "Pito" stated that his cousin is trying to "cook" a "brick" (kilogram) of cocaine into crack. "Pito" stated that his cousin has a lot of "projects" happening and has a lot of "people" working for him, which, based on my experience and training, I believe meant that "Pito"'s cousin has many individuals working for his narcotics organization.

e.    The CW advised "Pito" that s/he would check with his/her suppliers and see whether s/he could provide "Pito" with the cocaine that he requested.

(Kaleta Aff. ¶ 17);

The Kaleta Affidavit further indicated that, through photo identification, the CW identified "Pito" as Salas; Michael Salas as Salas's brother, and Casanova as Salas's cousin. Kaleta Aff. ¶ 18.

The Kaleta Affidavit further described an analysis of toll records and other telephone records showing that Salas had extensive cellphone contact with cellphones subscribed to by Casanova, Michael Salas's wife and mother-in-law, as well as cellphones associated with other suspected narcotics dealers.

(Kaleta Aff. ¶ 19).

Based on the "totality of the circumstances" laid out above and all the additional facts laid out in the Kaleta Affidavit, Chief Judge Wood had more than a "substantial basis" to find probable cause to believe that Salas was engaged in a conspiracy to distribute narcotics; that he was using the Salas Cellphone in connection with that offense; and that such communications would be obtained through the requested wiretaps. Because the Affidavit amply set forth a basis to make these three required findings, 18 U.S.C. § 2518(3), there is no basis to suppress the wiretap on probable cause grounds. See Diaz, 176 F.3d at 110; Wagner, 989 F.2d at 71, Ambrosio, 898 F. Supp. at 181.

Salas's arguments to the contrary are unavailing. First, Salas contends that "Agent Kaleta solely relied on Michael [Salas]'s prior [criminal] history to speculate that Mr. Salas [the defendant] and his brother were using the target cell phone in a drug conspiracy" and that "there is no evidence that Mr. Salas [the defendant] and his brother [Michael Salas] ever discussed drug transactions." Salas Mem. at 3. This contention is entirely without merit. As the above discussion indicates, Agent Kaleta relied on many facts other than Michael Salas's prior criminal history to determine that there was probable cause to intercept the Salas Cellphone, including the CW's statements

16

about Salas, Salas's use of the Salas Cellphone on consensually-
recorded calls to speak to the CW in furtherance of narcotics
dealing, and the recorded February 2007 meeting between the CW
and Salas concerning narcotics dealing.  Thus, it is simply false
to assert that Agent Kaleta only relied on Michael Salas's
criminal history to speculate that Salas was involved in
narcotics dealing.  In addition, it is irrelevant that the
defendant was not recorded speaking to Michael Salas about
narcotics dealing.  For purposes of showing probable cause, it
was sufficient that Salas had conversations with the CW using the
Salas Cellphone in furtherance of narcotics dealing.

          Second, Salas complains that the Kaleta Affidavit
referred to a December 28, 2006 call between the Salas Cellphone
and a telephone subscribed to in the name of "Karl Watson", who
Agent Kaleta described as an associate of a Mexican drug kingpin,
but that Salas does not know anyone named "Karl Watson" or any
associates of Mexican drug kingpins.  Salas Mem. at 3; Salas Aff.
¶ 9.  This contention is also without merit.  Even assuming that
Salas does not know anyone named "Karl Watson," the Kaleta
Affidavit nevertheless established that the Salas Cellphone was
used to contact the phone subscribed to in the name of "Karl
Watson."  The fact that Karl Watson is a known associate of a
Mexican drug kingpin, and that Salas's Cellphone was in touch
with the "Karl Watson" cellphone, formed part of the

justification for intercepting the Salas Cellphone.  The "Karl Watson" contact was not the only toll analysis that justified intercepting the Salas Cellphone, however; the toll analysis also showed that the Salas Cellphone was in communication with other suspected drug phones, including that one subscribed to by the defendant Phillip Casanova, one of his co-conspirators.  Kaleta Aff. 19.  Thus, the toll analysis properly supported the application for the April 4, 2007 Order, notwithstanding Salas's self-serving and irrelevant claim that he does not know anyone named Karl Watson.

Thus, when Chief Judge Wood signed the August 4, 2007 Order authorizing interception of the Salas Cellphone, the Court had a substantial basis, considering the Affidavit "as a whole," to find probable cause for the wiretap.  Ruggiero, 824 F. Supp. at 399 (a wiretap affidavit "must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated").  Because the Kaleta Affidavit amply set forth a basis to make the required findings, see 18 U.S.C. § 2518(3), given the deference that the Court must accord to the authorizing judge's findings, there is no basis to suppress the wiretap of the Salas Cellphone, or the fruits obtained thereof, on probable cause grounds.

b.  The Daly Affidavit

Salas moves to dismiss the wiretap evidence obtained

pursuant to the April 26, 2007 Order to intercept the Casanova Cellphone on probable cause grounds.  The argument should be rejected.  Salas makes no argument that probable cause was lacking in the Daly Affidavit.  Judge Griesa had a substantial basis, considering the Daly Affidavit as a whole, to find probable cause for the wiretap on the Casanova Cellphone on April 26, 2007, when he ordered the interception of that cellphone.

Specifically, in the Daly Affidavit, Special Agent Daly set forth a summary of the background information that led to the interception of the Salas Cellphone (Daly Aff. ¶ 15), as well as a summary of numerous calls intercepted on the Salas Cellphone showing that Salas was using it to speak to Casanova on the Casanova Cellphone about narcotics trafficking.  Daly Aff. ¶ 17-19.  These recorded calls corroborated the information provided by the CW concerning Salas's interest and willingness to traffic in narcotics.  In addition, the Daly Affidavit included toll analysis of the Casanova Cellphone showing that Casanova was using the Casanova Cellphone to speak to suspected drug cellphones other than the Salas Cellphone.  Daly Aff. ¶ 19.

Based on the totality of the circumstances described in the Daly Affidavit, Judge Griesa had more than a substantial basis to find probable cause to believe that Casanova was engaged in criminal activities with Salas and others; that Casanova was using the Casanova Cellphone in furtherance of narcotics

trafficking, and that communications about narcotics trafficking would be obtained through the requested wiretap.  See Diaz, 176 F.3d at 110; Wagner, 989 F.2d at 71, Ambrosio, 898 F. Supp. at 181.  Because the Daly Affidavit amply set forth a basis to make the required findings, see 18 U.S.C. § 2518(3), given the deference that the Court must accord to the authorizing judge's findings, there is no basis to suppress the wiretap of the Casanova Cellphone, or the fruits obtained thereof, on probable cause grounds.

**B.    The Issuing Judges Had Substantial Bases to Find Necessity to Support Both Wiretaps**

1.    Applicable Law

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of oral communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  United States v.

20

Kahn, 415 U.S. 143, 153 n.12 (1974).  The Second Circuit

explained the significance of these statutory requirements:

> [T]he purpose of the statutory requirements
> of § 2518 is not to preclude the Government's
> resort to wiretapping until after all other
> possible means of investigation have been
> exhausted by investigative agents; rather,
> the statute only requires that the agents
> inform the authorizing judicial officer of
> the nature and progress of the investigation
> and of the difficulties inherent in the use
> of normal law enforcement methods.

Diaz, 176 F.3d at 111 (citing United States v. Torres, 901 F.2d

205, 231 (2d Cir. 1990)).  See also United States v. Trippe, 171

F. Supp. 2d 230, 236 (S.D.N.Y. 2001); United States v. Lombardo,

98 Cr. 1180 (DLC), 1999 WL 305096 at *5 (S.D.N.Y. May 14, 1999).

Thus, Title III's "alternative investigative techniques" sections

do not establish a "requirement 'that any particular

investigative procedure be exhausted before a wiretap be

authorized.'"  United States v. Young, 822 F.2d 1234, 1237 (2d

Cir. 1987) (quoting United States v. Lilla, 699 F.2d 99, 104 (2d

Cir. 1983)); see also United States v. Miller, 116 F.3d 641, 663

(2d Cir. 1997) (same).

     The legislative history of the statute further makes

clear that Section 2518(1)(c) is not designed to force the

Government to exhaust all "other investigative techniques."  As

the Senate Report concerning the statute explained:

> Merely because a normal investigative
> technique is theoretically possible, it does
> not follow that it is likely.  What the

> provision envisions is that the showing be
> tested in a practical and commonsense
> fashion.

S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968

U.S.C.C.A.N. 2190 (citations omitted); see also United States v.

Ruggiero, 726 F.2d 913, 924 (2d Cir. 1984); Trippe, 171 F. Supp.

2d at 236 ("the application must be viewed in a practical and

common sense manner and need be only minimally adequate to

support the issuing judge's determination of necessity").

As discussed above, significant deference is owed by

the reviewing court to the issuing court's prior finding of

probable cause; the same is true as to the finding of necessity.

United States v. Gigante, 979 F. Supp. 959, 963 (S.D.N.Y. 1997)

("In subsequently reviewing these determinations [probable cause

and necessity], the trial court must accord substantial deference

to the findings of the issuing judicial officer, limiting its

review to whether the issuing judicial officer had a 'substantial

basis' for making the requisite findings.") (citing United States

v. Wagner, 989 F.2d 69, 71 (2d Cir. 1993)); see also Trippe, 171

F. Supp. 2d at 236 ("[T]he application must be viewed in a

practical and common sense manner and need be only minimally

adequate to support the issuing judge's determination of

necessity.") (citing Torres, 901 F.2d at 231).

2.   Discussion

Salas contends that the necessity requirement was not

met for one or both of the affidavits in this case on the grounds
that the agents "never bothered to conduct a full undercover
operation and merely relied on the statements of one confidential
witness." Salas Mem. at 4. Salas makes no argument and cites no
facts in support of this conclusory assertion, and it is without
merit. Both the Kaleta Affidavit and the Daly Affidavit include
detailed, case-specific explanations of the necessity to
intercept the Salas and Casanova Cellphones respectively.
Section 2518(1)(c) simply requires the Government to provide "a
full and complete statement as to whether or not other
investigative procedures have been tried and failed or why they
reasonably appear to be unlikely to succeed if tried or to be too
dangerous." Viewed against this standard, it is abundantly clear
that there is no basis to suppress the Salas Cellphone or
Casanova Cellphone. Accordingly, the evidence obtained from the
wiretaps should not be suppressed on the grounds that necessity
was not established.

a.  The Kaleta Affidavit

The Kaleta Affidavit includes a detailed description of
other investigative techniques that have been tried, or
reasonably appeared likely to fail if they had been tried, or
were likely to be too dangerous to employ, including: electronic
surveillance of pagers, physical surveillance; review of
telephone records, use of a federal grand jury; witness

interviews; additional use of confidential informants, use of

undercover officers, use of search warrants, and arrests.  Kaleta

Aff. ¶ 22-30.  The Kaleta affidavit also includes a description

of the limits of each of these methods.  With respect to gaining

additional information through use of the CW, Agent Kaleta

explained:

> [T]he CW is of limited usefulness in this case.  The CW
> is being contacted by the TARGET SUBJECTS as a
> narcotics supplier.  Although the CW may be able to
> engage in a few discussions concerning a possible deal
> with some of the TARGET SUBJECTS, the CW cannot
> actually supply the TARGET SUBJECTS with drugs.  The
> CW's usefulness in this case, therefore, is very brief,
> because the TARGET SUBJECTS will likely cease
> interacting with the CW once they realize that the CW
> cannot deliver narcotics.  In any event, the CW has
> only provided limited information regarding the TARGET
> SUBJECTS, and is not privy to all the TARGET SUBJECTS'
> illegal activities.  The CW is, at most, a potential
> supplier for the TARGET SUBJECTS, a supplier who is
> generally kept at arm's-distance, especially given that
> the core of the target organization is composed of two
> brothers and their cousin.  In addition, narcotics
> organizations are generally highly-compartmentalized,
> and it is generally impossible for an informant or a
> cooperator to gain access to all aspects of an
> organization's illegal activities, even if one or more
> of the TARGET SUBJECTS confides in the cooperator.
> Thus, while one or two of the TARGET SUBJECTS may very
> well engage in discrete transactions with the CW, it is
> unlikely that they will invite them into the inner
> sanctum of their organization.  Using these cooperators
> alone would likely be inadequate to develop evidence
> about the TARGET SUBJECTS' suppliers and customers.
> Based on my experience as a narcotics investigator, I
> believe that drug traffickers are unlikely to discuss
> the full extent of their organization's activities or
> membership when dealing with an "outsider" such as the
> CW.  With the limited information provided, to date, by
> the CW, and without the evidence obtained from court-
> authorized interceptions, the objectives of this
> investigation cannot be met.

Kaleta Aff. ¶ 27.

      Agent Kaleta further explains that, for similar reasons, there were limits on the usefulness of an undercover operation in this case:

> For similar reasons, there is currently no expectation that an undercover officer will be able to determine the full scope of the TARGET SUBJECTS' operations, meet and identify all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates. Based on my experience as a narcotics investigator, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer. In my experience, narcotics traffickers are usually highly reticent about discussing narcotics with unknown persons. In addition, as discussed above, the insertion of an undercover officer would involve unacceptable security risks.

Kaleta Aff. ¶ 28. This passage fully explains why the agents did not attempt to introduce an undercover officer into the operation – the agents believed that such an introduction would fail given the tendency of narcotics dealers to avoid "outsiders", and that such an introduction would entail security risks. Accordingly, Salas's contention that the "agents never bothered to conduct a full undercover operation and merely relied on the statements of one confidential witness" (Salas Mem. at 4) – is unavailing, and there is no basis to suppress the wiretap evidence obtained from the Salas Cellphone on necessity grounds.

      b.  <u>The Daly Affidavit</u>

      There is also no basis to suppress the wiretap evidence

obtained from the Casanova Cellphone on necessity grounds.  The
Daly Affidavit in support of the April 26, 2007 Order to
intercept the Casanova Cellphone includes a detailed description
of other investigative techniques that were insufficient in that
they had been tried, or reasonably appeared likely to fail if
they had been tried, or were likely to be too dangerous to
employ, including: interception of the Salas Cellphone, physical
surveillance; review of telephone records, use of a federal grand
jury; witness interviews; additional use of confidential
informants, use of undercover officers, use of search warrants,
and arrests.  Daly Aff. ¶ 23-31.  The Daly Affidavit also
included a description of the limits of each of these methods.
With respect to gaining additional information through use
additional confidential sources or an undercover officer, the
Daly Affidavit contains a description that is similar to that
included in the Kaleta Affidavit.  Daly Aff. ¶ 28-29.  As in the
case of the Kaleta Affidavit, the relevant passage in the Daly
Affidavit explains why the agents did not attempt to introduce an
undercover officer into the operation.  Accordingly, Salas's
contention that the "agents never bothered to conduct a full
undercover operation and merely relied on the statements of one
confidential witness" (Salas Mem. at 4) – is unavailing, and
there is no basis to suppress the wiretap evidence obtained from
the Casanova Cellphone on necessity grounds.

C.    **Evidence From The Wiretaps Was Obtained In Good Faith
      and Should Not Be Suppressed**

For the reasons stated above, there is no basis to
suppress the wiretaps in this case either on probable cause or
necessity grounds.  Furthermore, even were the Court to question
the probable cause or necessity findings of Judges Wood and
Griesa, there is still no basis for suppression because the
agents reasonably relied upon the wiretap orders.

Wiretap evidence obtained in violation of Title III is
subject to suppression under 18 U.S.C. § 2515, which provides for
exclusion of such evidence if disclosure "would be in violation
of this chapter."  See also 18 U.S.C. § 2518(10) (specifying
grounds for suppression).  While the statute thus contains its
own exclusionary provisions, most courts have held that the
exceptions to the Fourth Amendment's exclusionary rule are
equally applicable under Title III, and that, in particular, the
holding of United States v. Leon, 468 U.S. 897, 922 (1984) --
that evidence will not be suppressed if it was obtained by agents
in objectively reasonable good faith reliance on a search warrant
-- applies equally to motions to suppress evidence obtained under
wiretap orders.  See United States v. Moore, 41 F.3d 370, 376-77
(8th Cir. 1994) (applying Leon's good faith exception to evidence
seized under wiretap order which was invalid because it was not
correctly signed, and stating that Title III's "legislative
history expresses a clear intent to adopt suppression principles

27

developed in Fourth Amendment cases"); United States v.
Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988) (where wiretap
order was invalid because probable cause in wiretap application
was based on illegal search, suppression of wiretap is not
appropriate under Leon because suppression would have no
deterrent value); United States v. Bellomo, 954 F. Supp. 630, 638
(S.D.N.Y. 1997) (even if court found no probable cause for
wiretap order, wiretap evidence would not be suppressed where
agents enforcing the order acted in good faith reliance); United
States v. Ambrosio, 898 F. Supp. 177, 186-89 (S.D.N.Y. 1995)
(applying good faith exception to wiretaps).  But see Ambrosio,
898 F. Supp. at 187 (collecting earlier district court decisions
declining to apply Leon to wiretap orders).

      In United States v. Bianco, 998 F.2d at 1125-26, the
Second Circuit squarely rejected the contention that Title III's
exclusionary provisions preclude application of the exceptions to
the Fourth Amendment exclusionary rule which the Supreme Court
has adopted in recent years.  The Court in Bianco thus held that
the holding of Franks v. Delaware, 438 U.S. 154 (1978), that
evidence seized pursuant to a search warrant would not be
suppressed on the basis of false statements or omissions in the
application unless they were intentional and material, was
equally applicable to wiretaps.  Bianco, 998 F.2d at 1126.  The
Court's analysis in Bianco strongly suggests that the good faith

exception of <u>Leon</u> also applies to wiretaps.  The good faith exception of <u>Leon</u> is analogous to the holding of <u>Franks</u> and serves the same purpose of declining to suppress evidence when there would be no deterrent purpose served by suppression. Indeed, the <u>Bianco</u> Court specifically cited <u>Leon</u> as one of the exclusionary rule exceptions it had in mind in concluding that Fourth Amendment principles apply to the exclusion of evidence under Title III.  <u>Id.</u> at 1126.

Following this precedent, courts within this district have repeatedly applied the <u>Leon</u> good faith exception to motions to suppress Title III wiretap orders.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Scala</u>, 388 F. Supp. 2d 396, 403 (S.D.N.Y. 2005); <u>United States</u> v. <u>Gotti</u>, 42 F. Supp. 2d 252, 267 (S.D.N.Y. 1999); <u>United States</u> v. <u>Bellomo</u>, 954 F. Supp. 630 (S.D.N.Y. 1997).

Thus, under the "good faith" exception to suppression, a wiretap should not be suppressed unless "1) the issuing judge abandoned his detached, neutral role; 2) the agent was dishonest or reckless in preparing the affidavit supporting the issuance of the wiretap order; or 3) the agent's reliance on the warrant was not objectively reasonable."  <u>United States</u> v. <u>Ambrosio</u>, 898 F. Supp. at 189; <u>see also</u> <u>United States</u> v. <u>Scala</u>, 388 F. Supp. 2d 396, 403 (S.D.N.Y. 2005) (applying the <u>Leon</u> "good faith" exception to a wiretap suppression motion); <u>United States</u> v. <u>Gotti</u>, 42 F. Supp. 2d 252, 267 (S.D.N.Y. 1999) (same) ; <u>United</u>

States v. Bellomo, 954 F. Supp. 630 (S.D.N.Y. 1997) (same).

Salas does not even contend, let alone establish, that Judges Wood or Griesa abandoned their detached, neutral role, or that the agents were dishonest or reckless in preparing their respective affidavits, or that the agents' reliance on the warrants was objectively unreasonable.  Accordingly, there is no basis to suppress the evidence obtained from either wiretap, or the fruits thereof.

D.    **Salas's Request For A *Franks* Hearing Should Be Denied**

Salas requests a hearing on the grounds that the Kaleta and Daly Affidavits contained "false statements and omissions" (Salas Mem. 9).  In making this request in his Memorandum of Law, Salas does not specify a single false statements or omissions in the affidavits.  It appears, based on the Salas Affidavit, that Salas contends that Agents Kaleta and Daly falsely stated that Casanova is Salas's cousin, when, Salas claims, Casanova is not.  Salas Aff. 8, 12.  The request for a Franks hearing on this issue should be denied.

1.    Applicable Law

It is well settled that before a defendant can obtain a hearing to challenge the accuracy of sworn statements in an agent's application for authorization to conduct a Title III investigation, the defendant must first make a "substantial preliminary showing" that the claimed inaccuracies are the result

30

of the affiant's "deliberate falsehood or of [his] reckless disregard for the truth."  Franks v. Delaware, 438 U.S. 154, 171-72 (1978); accord United States v. Campino, 890 F.2d 588, 591-92 (2d Cir. 1989); United States *v.* Levasseur, 816 F.2d 37, 43 (2d Cir. 1987); United States v. Ferguson, 758 F.2d 843 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 151-53 (2d Cir. 1979).[1]  In addition to "a preliminary showing that a false statement" was made knowingly, intentionally, or with reckless disregard, the defendant must show that the allegedly false statement was "necessary" to the finding of probable cause. Franks, 438 U.S. at 155-56; see also United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993); Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991); United States v. One Parcel of Property, 897 F.2d 97, 100 (2d Cir. 1990); Campino, 890 F.2d at 591-92; United States v. Orozco-Prada, 732 F.2d 1076, 1089 (2d Cir. 1984); Barnes, 604 F.2d at 151-53; United States v. Labate, No. 00 Cr. 632 (WHP), 2001 WL 533714, at *17 (S.D.N.Y. May 18, 2001); United States v. Gotti, 771 F. Supp. 535, 539 (E.D.N.Y. 1991).

 Material omissions from an affidavit are governed by

---

[1] The Franks standard applies to challenges to a Title III Order based upon alleged misrepresentations or material omissions in the underlying affidavit.  See United States v. Fermin, 32 F.3d 674, 677 (2d Cir. 1994) (applying Franks to representations impacting probable cause for Title III authorization); United States v. Bianco, 998 F.2d at 1125-27; United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985); United States *v.* Shakur, 82 Cr. 312 (CSH), 1987 WL 9708, at *4 (S.D.N.Y. April 10, 1987).

the same standards as false statements.  <u>Campino</u>, 890 F.2d at
592; <u>Ferguson</u>, 758 F.2d at 848; <u>United States</u> v. <u>Mankani</u>, 738
F.2d 538, 545-46 (2d Cir. 1984).  In short, the defendant must
"show that the omission was necessary to a finding of probable
cause."  <u>United States</u> v. <u>Ambrosio</u>, 898 F. Supp. 177, 189
(S.D.N.Y. 1995).  As the Fourth Circuit has articulated this
test, "for an omission to serve as the basis for a hearing under
<u>Franks</u>, it must be such that its inclusion in the affidavit would
defeat probable cause."  <u>United States</u> v. <u>Colkley</u>, 899 F.2d 297,
301 (4th Cir. 1990).

        An affiant plainly cannot be expected to include every
piece of information learned during the investigation.  Hence,
any affidavit will include "intentional" omissions.  Yet

> [if] this type of 'intentional' omission is
> all that <u>Franks</u> requires, the <u>Franks</u> intent
> prerequisite would be satisfied in almost
> every case.  <u>Franks</u> clearly requires
> defendants to allege more than 'intentional'
> omission in this weak sense. . ..  <u>Franks</u>
> protects against omissions that are <u>designed
> to mislead</u> or that are made in <u>reckless
> disregard of whether they would mislead</u> the
> magistrate.

<u>Colkley</u>, 899 F.2d at 300-01 (emphasis in original).

        In addition, the alleged falsehood must have come from
the affiant, not a non-governmental informant.  "Probable cause
is not defeated because an informant may have erred or lied so
long as the affiant accurately represented what was told to him."

<u>United States</u> v. <u>Navarro</u>, 767 F. Supp. 544, 546 (S.D.N.Y. 1991)
(citations omitted).  The Second Circuit has held that as a
"general rule," "if an informant knowingly or recklessly makes a
false statement to an affiant, that does not present grounds to
challenge the search warrant so long as the affiant in good faith
accurately represents what the informant told him."  <u>United</u>
<u>States</u> v. <u>Wapnick</u>, 60 F.3d 948, 956 (2d Cir. 1995).  Furthermore,
"[t]o mandate an evidentiary hearing, the challenger's attack
must be more than conclusory and must be supported by more than a
mere desire to cross-examine."  <u>Franks</u>, 438 U.S. at 171.  Rather,
the defendant must make specific "allegations of deliberate
falsehoods or of reckless disregard for the truth, and those
allegations must be accompanied by an offer of proof," either in
the form of affidavits or otherwise reliable statements of
witnesses.  <u>Franks</u>, 438 U.S. at 171.

  2.  <u>Discussion</u>

   There is no reason for a <u>Franks</u> hearing in this case.
The purportedly false statement – that Casanova is Salas's
cousin, when, Salas claims, he is not – came from the CW, not
from the agent.  As such, probable cause is not defeated.
<u>Navarro</u>, 767 F. Supp. at 546 ("Probable cause is not defeated
because an informant may have erred or lied so long as the
affiant accurately represented what was told to him.").  With
respect to any purported omission, to merit a <u>Franks</u> hearing

Salas must show that the alleged omission was such that its
inclusion in one of the wiretap affidavits would have defeated
probable cause.  He makes no such showing.  In addition, there is
absolutely no basis to conclude that this or any other statement
of Agent Kaleta or Daly was deliberately false or made with a
reckless disregard for the truth. Accordingly, there is no basis
for the Court to hold a <u>Franks</u> hearing because Salas has wholly
failed to make the rigorous showing needed to justify such a
hearing.

    **E.**   **<u>Salas's Request For A Hearing Regarding Minimization
Should Be Denied</u>**

Salas contends that the Court should hold a hearing to
determine whether the Government complied with the minimization
requirements of the wiretap orders in this case.  Salas. Mem. at
5.  The sole basis for the hearing is that, based on a
"preliminary review" of the wiretap recordings that were produced
in discovery in this case, it appears that the agents "minimized
a small percentage of the conversations." Salas Mem. at 5.  The
Court should deny this motion without a hearing because the
Government complied with the minimization requirements of Title
III.

    1.   <u>Standing</u>

On the present record, Salas has not demonstrated that
he has standing to challenge the minimization procedures used
during the interceptions of the Casanova Cellphone.  The Second

Circuit has consistently held that only individuals with a possessory or proprietary interest in the subject telephone is located have standing to contest the minimization procedures employed by law enforcement agents.  See Ruggiero, 928 F.2d 1289, 1303 (2d Cir.), cert. denied, 502 U.S. 938 (1991); United States v. Gallo, 863 F.2d 185, 192 (2d Cir. 1988), cert. denied, 489 U.S. 1083 (1989); United States v. Fury, 554 F.2d 522, 526 (2d Cir.), cert. denied, 433 U.S. 910 (1977); United States v. Poeta, 455 F.2d 117, 120, 122 (2d Cir.) (even though Poeta's conversations were intercepted, "this tap was on Stephenburg's telephone not Poeta's.  Poeta lacks standing to contest any such invasion of Stephenburg's rights"), cert. denied, 406 U.S. 948 (1972); United States v. Villegas, No. 92 Cr. 699 (CSH), 1993 WL 535013, at *8 (S.D.N.Y. Dec. 22, 1993) (no standing as to defendant who has no proprietary interest in a cellphone; "An analysis of the applicable cases demonstrated that the Second Circuit considers the challenging defendant's privacy interest in the home containing the phone the touchstone for determining standing to challenge minimization techniques."); United States v. Rodriguez, 734 F. Supp. 116, 122 (S.D.N.Y. 1990), aff'd, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992); United States v. Dellacroce, 625 F. Supp. 1387, 1393-94 (E.D.N.Y. 1986). Indeed, in United States v. Prada, No. 90 Cr. 306-S-1 (KMW), 1991 WL 161323, *3 (S.D.N.Y. Aug. 13, 1991), this Court recognized

that, in order to challenge minimization procedures with respect to a cellphone, a defendant must establish a possessory or proprietary interest over the target cellphone.  See also United States v. Castillo-Martinez, 2007 WL 1026363, at *5 (W.D.N.Y. 2007)(defendant lacks standing to challenge minimization of calls intercepted over cellphone line as to which he has failed to demonstrate a privacy interest).

Accordingly, merely being an aggrieved person under 18 U.S.C. § 2518(10)(a) "'does not give [defendants] an unlimited right to enforce minimization requirements where they do not possess independent privacy rights in the phone tapped.'"  United States v. Squitieri, 688 F. Supp. 163, 169 (D.N.J. 1988) (quoting United States v. Massino, 605 F. Supp. 1565, 1575 (S.D.N.Y. 1985), rev'd on other grounds, 784 F.2d 153 (2d Cir. 1986)), aff'd mem., 879 F.2d 859 (3rd Cir.), cert. denied, 493 U.S. 954 (1989).

In the instant case, although Salas has admitted that he used the Salas Cellphone, Salas Aff. ¶ 4, he makes no such claim with respect to the Casanova Cellphone.  Salas therefore has no standing to argue that the minimization procedures with respect to the Casanova Cellphone were inadequate.  Accordingly, there is no basis for a minimization hearing with respect to the Casanova Cellphone.

2.  <u>The Requirements of Minimization</u>

Section 2518(5) of Title 18 provides that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  The Supreme Court addressed Title III's minimization requirements in <u>Scott</u> v. <u>United States</u>, 436 U.S. 128 (1978).  There, the Government had obtained authorization to listen on a single telephone to conversations of nine persons allegedly involved in drug trafficking.  Based upon this authorization, the agents listened for a full month to <u>all</u> telephone conversations over that telephone, making <u>no</u> efforts to minimize.  Even on these facts, the Supreme Court rejected the defendant's assertion that the agents had failed to comply with the minimization requirement.

In <u>Scott</u>, the Court noted that Title III "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."  <u>Id</u>. at 140; <u>see</u> <u>also</u> <u>United States</u> v. <u>Terry</u>, 702 F.2d at 312 ("the standard . . . is that agents observe reasonable safeguards against excessive intrusion"); <u>United States</u> v. <u>Nersesian</u>, 824 F.2d 1294, 1307 (2d Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 957 (1987). The Supreme Court in <u>Scott</u> went on to hold that compliance with the minimization requirement depended upon the reasonableness of

37

the surveilling agent's conduct, 436 U.S. at 137-39; see also United States v. Napolitano, 552 F. Supp. 465, 476 (S.D.N.Y. 1982), and this requires an ad hoc analysis of the facts surrounding the particular interception. Scott, 436 U.S. at 139.

Scott and subsequent cases have provided several factors to be considered in evaluating whether a court-authorized electronic surveillance had been properly minimized. First, courts have noted that it is not at all unreasonable for the monitoring agents to intercept large numbers of non-pertinent telephone calls when the conversations are short, when they occur only once, or when they are ambiguous in nature. Scott, 436 U.S. at 140. Indeed, given the need to register calls, identify the participants and determine whether the subject matter being discussed is relevant, the courts have held that the minimization requirement does not extend to calls lasting two minutes or less. See United States v. Armocida, 515 F.2d 29, 45 (3d Cir.) (full interception of two minute conversation does not violate minimization requirement), cert. denied, 423 U.S. 858 (1975); United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973) (calls of two minutes or less eliminated from consideration in minimization analysis), vacated on other grounds, 417 U.S. 903 (1974); United States v. Capra, 501 F.2d 267, 275 (2d Cir. 1974) (considering number of interceptions of conversations over two minutes in determining whether minimization efforts reasonable),

cert. denied, 420 U.S. 990 (1975).

Furthermore, the Court in Scott stressed that "the percentage of non-pertinent calls [may be] relatively high and yet their interception [may] still [be] reasonable." 436 U.S. at 140; see also United States v. Turner, 528 F.2d 143, 157 (9th Cir.) (wiretap upheld although 78% of completed calls which were intercepted were not narcotics-related), cert. denied, 423 U.S. 996 (1975); United States v. Quintana, 508 F.2d 867, 873 (7th Cir. 1975) (minimization requirement met although all 2,000 telephone conversations recorded, only 153 were transcribed and only 47 used at trial); United States v. James, 494 F.2d 1007, 1018 (D.C. Cir.) (recording 5,000 telephone conversations intercepted during course of wiretap did not violate minimization requirement), cert. denied, 419 U.S. 1020 (1974); United States v. Manfredi, 488 F.2d 588, 593, 599, 600 n.8 (2d Cir. 1973) (New York State minimization requirements, as to which federal decisional law is persuasive, not violated when all conversations were intercepted, even though 80% were non-pertinent), cert. denied, 417 U.S. 936 (1974).

In addition, during the initial periods of interceptions, when monitoring agents are unfamiliar with the pattern of telephone calls, more non-pertinent conversations may be intercepted. Scott, 436 U.S. at 141; see also Manfredi, 488 F.2d at 600; Santoro, 647 F. Supp. at 160 ("the agents may have

39

more leeway at the start of the surveillance when they are less familiar with the subjects.").

       3.  <u>Discussion</u>

      Salas contends that, based on a "preliminary review" of the wiretap recordings that were produced in discovery in this case, it appears that the agents "minimized a small percentage of the conversations."  Salas Mem. at 5.  On the basis of this assertion alone – without reference to a single call as to which the Government did not meet its obligation – Salas seeks a hearing to determine the Government's compliance with the requirements of minimization.  The request for a hearing should be denied because Salas has offered no basis upon which to conclude that the Government did not comply with its minimization requirements.

      As an initial matter, the mere fact that a purportedly small percentage of calls were minimized does not establish that the minimization requirements were not met.  As courts have noted, it is not at all unreasonable for the monitoring agents to intercept large numbers of non-pertinent telephone calls when the conversations are short, when they occur only once, or when they are ambiguous in nature.  <u>Scott</u>, 436 U.S. at 140.  Indeed, many calls in this case were less than two minutes in length, and the minimization requirement does not extend to such calls.  <u>United States</u> v. <u>Bynum</u>, 485 F.2d at 500.  Without a showing by Salas

40

that a large number of calls in excess of two minutes were not
properly minimized, Salas's assertion is irrelevant.  In
addition, with respect to calls in excess of two minutes, it may
well be that a large percentage of those calls were not minimized
because they were pertinent (i.e., related to narcotics dealing),
or because they needed to be recorded to determine who Salas's
co-conspirators were.  United States v. King, 991 F. Supp. 77, 92
(E.D.N.Y. 1998) (noting "the difficulties of minimization in a
case, where as here, not all of the conspirators have been
identified").

        Further, as discussed above, the Supreme Court in Scott
held that compliance with the minimization requirements depended
upon the reasonableness of the monitoring agents' conduct.  436
U.S. at 137-39.  As this Court has stated, "To assess
reasonableness courts look at the purposes of the wiretap and the
'totality of circumstances' of each case." Prada, 1991 WL
161323, at *4 (citations omitted).  Here, as in Prada, the
purpose of the wiretap was broad.  For example, in her April 4,
2007 Order authorizing interception of the Salas Cellphone, Judge
Wood found that there was probable cause to believe that
interception of wire communications over the Salas Cellphone
would reveal: (i) the nature, extent, and methods of operation of
the narcotics business and activities of the Salas and other
"Target Subjects"; (ii) the identities and roles of accomplices,

aiders and abettors, co-conspirators, and other participants in
their illegal activities; (iii) the receipt and distribution of
contraband and money involved in those activities; (iv) the
locations and items used in furtherance of those activities; (v)
the existence and locations of records; (vi) the location and
source of resources used to finance their illegal activities; and
(vii) the location and disposition of the proceeds from those
activities.  April 4, 2007 Order, at 2-3.  Because the purpose of
the wiretap was broad, the agents were permitted to intercept a
correspondingly broad array of calls.

        In addition, minimization was made more difficult in
this case because the defendants not only spoke Spanish during
the majority of the intercepted conversations, but they generally
did not refer explicitly to drugs, but rather used code words.
This made minimization particularly difficult in this case.  As
this Court stated in Prada, "courts have recognized that
'minimization may be more difficult and more extensive
surveillance may therefore be permitted' where, as here, 'the
targets use jargon or code words or speak in a foreign
language.'"  1991 WL 161323, at *6 (citing Santoro, 647 F. Supp.
at 160, and cases cited therein).

        Moreover, courts have identified several measures
which, if taken by the Government, make a finding of compliance
with the minimization requirements more likely.  See Prada, 1991

WL 161323, at *6 (citations omitted).  These include:  (1) the
maintenance of monitoring logs, United States v. Hinton, 543 F.2d
at 1011-12; United States v. Rizzo, 491 F.2d 215, 217 (2d Cir.),
cert. denied, 416 U.S. 990 (1974); Santoro, 647 F. Supp. at 160;
(2) judicial supervision of the progress of the surveillance,
Santoro, 647 F. Supp. at 160; (3) the provision of written and
oral instructions to monitoring personnel regarding the legal
requirements for minimization and the maintenance of monitoring
logs, id. at 161; (4) requiring all monitoring personnel to read
the minimization instructions, Court orders and applications, and
posting of these documents at the monitoring plant, id.; and (5)
supervision by the prosecutor, see Rizzo, 491 F.2d at 217;
Santoro, 647 F. Supp. at 160-61.

     In this case, Salas does not dispute (1) that the
agents maintained monitoring logs, which have been produced to
the defense and which are available for the Court's review upon
request; (2) that there was judicial supervision of the progress
of the surveillance, as indicated by the periodic reports filed
as to each wiretap, attached hereto as Exhibits F, G, H, and I;
(3) that written and oral instructions were provided to
monitoring personnel regarding the legal requirements for
minimization and the maintenance of monitoring logs, which in
fact they were, with respect to both wiretaps (4) that all
monitoring personnel were required to read the minimization

instructions, court orders and applications, and these documents
were posted at the monitoring plant (copies of the minimization
instructions, with agents' signatures, are attached hereto as
Exhibits D and E; and (5) that there was supervision by the
prosecutor.  Given the conclusory nature of Salas's minimization
argument, these undisputed facts alone are sufficient to deny
Salas's request for a hearing.  See Prada, 1991 WL 161323, at *6
(citations omitted).

          In any event, the wiretap statute does not forbid the
interception of non-pertinent conversations, but only requires
that a reasonable effort be made to minimize such intrusions.
See Scott, 436 U.S. at 141; United States v. Ianniello, 621 F.
Supp. 1455, 1471 (S.D.N.Y. 1985).  The fact that a conversation
may begin with a discussion of non-pertinent issues does not
necessarily warrant immediate minimization.  As Judge Weinfeld
has noted, it is common "for conversations to treat more than one
subject, and entirely possible for such dialogues to be comprised
of innocent matters, interspersed with topics of a criminal
nature.  The statutory requirement of minimization does not mean
that only communications exclusively devoted to criminal subjects
may be intercepted."  United States v. Ianniello, 621 F. Supp. at
1471; see also United States v. Wilson, 835 F.2d 1440, 1445-46
(D.C. Cir. 1987).

          After examining the totality of the circumstances in

44

this case, it is clear that the Government made good faith, diligent efforts at minimization and, as a result, properly minimized the interception of all non-pertinent communications.[2] As this Court held in <u>Prada</u>,

> in light of [the issuing judges'] broad grant of investigative authority, the broad scope of the conspiracy here, the many calls under two minutes, the use of coded language, the minimization of a large percentage of calls over two minutes, and defendants' lack of showing to the contrary, the court finds that the government complied with the minimization requirements of § 2518(5) and finds that no hearing is necessary on that issue.

1991 WL 161323, at *6. Thus, Salas's request for a hearing regarding minimization should be denied. <u>See</u> <u>United States</u> v. <u>Giovannelli</u>, 2004 WL 48869, *3 (S.D.N.Y. 2004) (defendants not entitled to minimization hearing because they "have not adduced any material evidence that the Government failed to take appropriate steps to minimize the intercept of communications not otherwise subject to interception."); <u>United States</u> v. <u>Badalamenti</u>, 1985 WL 2572, *7 (S.D.N.Y. 1985) (finding that the "mere fact of the conduct of a wiretap" is not enough to require a minimization hearing "where no colorable issue has been raised

---

[2] Even if Salas could point to particular calls that should have been minimized, in the context of an overall good faith effort to minimize, it would be more appropriate to suppress only those particular calls rather than to suppress the wiretap as a whole. <u>See</u> <u>United States</u> v. <u>Principie</u>, 531 F.2d 1132, 1139-41 (2d Cir. 1976), <u>cert</u>. <u>denied</u>, 430 U.S. 905 (1977); <u>United States</u> v. <u>Shakur</u>, 560 F. Supp. 318, 326 (S.D.N.Y. 1983), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom</u>., <u>United States</u> v. <u>Ferguson</u>, 758 F.2d 843 (2d Cir.), <u>cert</u>. <u>denied</u>, 474 U.S. 841 (1985).

by the papers"); <u>United States</u> v. <u>Giacalone</u>, 853 F.2d 470, 472,
483 (6th Cir. 1988) (affirming denial of minimization hearing
where defendants did not provide "specific examples of
conversations which should not have been monitored" and did not
"make at least some initial showing of contested facts to be
entitled to such a hearing").

## II. Salas's Motion To Suppress Evidence Recovered From His Apartment Should Be Denied

Salas moves to suppress any evidence seized from the
June 4, 2007 search of his apartment, 95-09 Jamaica Avenue,
Apartment 1R, Woodhaven, New York, on the ground that the warrant
was "overbroad, acting as a 'general warrant' rather than a
particularized one," thereby rendering the warrant unlawful.
Salas Mem. at 7-8. Salas does not explain any respect in which
the warrant is "overbroad." In fact, the warrant affidavit and
the warrant itself are quite specific in their description of the
premises to be searched and the items to be seized. Thus,
Salas's argument is meritless, and the motion should be denied.

### A. Applicable Law

The legal standard for determining whether a particular
warrant application is supported by probable cause is well
established. "The task of the issuing magistrate is simply to
make a practical, common-sense decision whether, given all the
circumstances set forth in the affidavit . . . there is a fair
probability that contraband or evidence of a crime will be found

46

in a particular place." <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 238

(1983). Such determinations must be approached in a practical

way, <u>id.</u> at 232, because "probable cause is a flexible,

common-sense standard." <u>Texas</u> v. <u>Brown</u>, 460 U.S. 730, 742

(1983). The evidence presented to the Magistrate Judge,

therefore, "'must be seen and weighed not in terms of library

analysis by scholars, but as understood by those versed in the

field of law enforcement.'" <u>Gates</u>, 462 U.S. at 231-32 (quoting

<u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 418 (1981)); <u>see also</u>

<u>United States</u> v. <u>Shipp</u>, 578 F. Supp. 980, 985 (S.D.N.Y. 1984)

(Weinfeld, J.) ("The standard in reviewing a previous

determination of probable cause for the issuance of a search

warrant by a judicial officer is 'only a probability and not a

prima facie showing of criminal activity.'" (quoting <u>United</u>

<u>States</u> v. <u>Travisano</u>, 724 F.2d 341, 345-46 (2d Cir. 1983)).

     The duty of a court reviewing a Magistrate Judge's

probable cause determination is "simply to ensure that the

magistrate had a substantial basis for . . . conclud[ing] that

probable cause existed." <u>Gates</u>, 462 U.S. at 214. The

information considered by the Magistrate Judge should take into

account the "totality-of-the-circumstances" and entail an

"assessment of probabilities in particular factual contexts."

<u>Id</u>. at 232-33; <u>see also</u> <u>United States</u> v. <u>Martino</u>, 664 F.2d 860,

867 (2d Cir. 1981) (reminding that "[t]he determination of

47

whether information presented in support of an application is
sufficiently current to support a finding of probable cause is
one that must be made on the basis of the facts of each case").
Moreover, once a "neutral and detached magistrate" issues a
search warrant upon a finding of probable cause, that finding is
"entitled to substantial deference, and 'doubts should be
resolved in favor of upholding the warrant.'"  United States v.
Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (quoting Travisano, 724
F.2d at 345)).  See also United States v. Singh, 390 F.3d. 168,
181 (2d Cir. 2004); Gates, 462 U.S. at 236; United States v.
Smith, 9 F.3d 1007, 1012 (2d Cir. 1993); United States v.
Jakobetz, 955 F.2d 786, 803 (2d Cir. 1992).  "A reviewing court
should not interpret supporting affidavits in 'a hypertechnical,
rather than a commonsense manner . . . . [T]he resolution of
doubtful cases . . . should be largely determined by the
preference to be accorded to warrants.'"  United States v. Dinero
Express, 2000 WL 254012, *6 (S.D.N.Y. Mar. 6, 2000) (internal
quotations omitted) (quoting United States v. Smith, 9 F.3d at
1012 (quoting United States v. Ventresca, 380 U.S. 102, 109
(1965)).  Indeed, the magistrate's "finding of probable cause is
itself a substantial factor tending to uphold the validity of
[the] warrant."  Travisano, 724 F.2d at 345.

      With respect to the specificity of the items seized, a
warrant only need be "'sufficiently specific to permit the

48

rational exercise of judgment [by the executing officers] in selecting what items to seize.'" United States v. LaChance, 788 F.2d 856, 874 (2d Cir. 1986) (quoting United States v. Vargas, 621 F.2d 54, 56 (2d Cir. 1980)).  Warrants authorizing the search for "generic classes of items" are permissible where a "more precise description is not possible, and where the warrant identified a "specific illegal activity" to which the items related.  Id. at 76.

        Finally, even in instances where evidence is seized pursuant to a warrant for which probable cause is later found lacking, the evidence nevertheless is admissible upon a showing that the officers who executed the warrant did so in "objective good faith." United States v. Leon, 468 U.S. 897, 923 (1984). The test for ascertaining whether the agents acted in good faith requires assessment of "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n.23.

   **B.  Discussion**

        In this case, the warrant to search the 95-09 Jamaica Avenue, Apartment 1R, Woodhaven, New York ("the Premises") was issued on the basis of a 7-page sworn affidavit by Agent Kaleta dated June 4, 2007 ("Search Warrant Aff.").  The affidavit, which is annexed hereto as Exhibit J, along with the warrant, describes in considerable detail (i) the investigation into Salas's

49

narcotics dealing, (ii) the connection between Salas's narcotics
dealing and the Premises, and (iii) the evidence Agent Kaleta
expected to find at the Premises.

Magistrate Judge James Orenstein of the United States
District Court for the Eastern District of New York issued the
warrant on June 4, 2007, after a review of the affidavit and the
proposed search warrant.  The Search Warrant Affidavit described,
among other things, the background of the investigation and
several calls recorded pursuant to the wiretap orders in this
case.  In one such call, on April 13, 2007, Salas stated, in
substance and in part, that he would take drugs to his "house."
Search Warrant Aff. ¶5(a).  The Search Warrant Affidavit also
described a May 3, 2007 call in which Salas stated, in substance
and in part, that in his "house" he had a list of people who owed
him money, i.e., a drug ledger.  Search Warrant Aff. ¶5(e).  In
addition, the Search Warrant Affidavit noted that, according to
New York State Department of Motor Vehicle Records, Salas resided
at the Premises, and that DEA agents saw Salas come and go from
the Premises on numerous occasions during the investigation.
Search Warrant Aff. ¶5, 7.  Based on this and other information
contained in the Search Warrant Affidavit, there was probable
cause to search the Premises and the search was otherwise lawful.
Once  a "neutral and detached magistrate" issues a search warrant
upon a finding of probable cause, that finding is "entitled to

substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (quoting Travisano, 724 F.2d at 345)). See also United States v. Singh, 390 F.3d. 168, 181 (2d Cir. 2004); Gates, 462 U.S. at 236; United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993); United States v. Jakobetz, 955 F.2d 786, 803 (2d Cir. 1992).

Finally, even assuming for the sake of argument that some portion of the warrant is found to be defective, the fruits of the search should not be suppressed because the agents executing the search acted in objective, good faith reliance on the warrants. The exclusionary rule does not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated warrant." United States v. Leon, 468 U.S. at 922; United States v. Singh, 390 F.3d at 181, 183; United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998) (holding in a child pornography case that, even if the warrant were invalid, the Government could introduce evidence seized pursuant to that warrant because law enforcement officers obtained the evidence in objective, good faith reliance on the facially valid warrant). Salas has offered nothing to suggest that the agents executing the search of the Premises operated in anything other than such good faith reliance. Thus, even if Salas's challenge to the warrant succeeds – which it should not – the warrant was not so

facially deficient that the executing agents could not reasonably presume it to have been valid.  Accordingly, the <u>Leon</u> good faith exception to the exclusionary rule permits the introduction of the seized materials in evidence, and Salas's motion to suppress should be denied.

Salas's sole claim with respect to the search of the Premises is that the warrant was "overbroad, acting as a 'general warrant' rather than a particularized one," thereby rendering the warrant unlawful.  Salas Mem. at 7-8.  This argument is meritless.  Salas does not explain in what respect he believes the warrant is "overbroad."  Indeed, Salas does not even specify whether he believes the description of the Premises is overbroad, or the list of items to be seized at the Premises is overbroad. Either way, the argument fails, because both the description of the Premises and the list of items to be seized were sufficiently specific.

With respect to the Premises, the Premises were described in the Search Warrant Affidavit as follows:

> Other agents and I have conducted surveillance of the **PREMISES.**  Based on my observations and on my conversations with other agents, I know that the **PREMISES** is located in the rear of a large mixed-use building located at 95-09 Jamaica Avenue in Woodhaven, New York.  The front of the building facing the street is principally occupied by commercial store fronts.  In order to access the **PREMISES,** one must walk down a short alley toward the rear of the building that opens into a courtyard.  Various apartment doors are accessible directly from the courtyard, and the **PREMISES** is one of them.  The door to the **PREMISES** is

52

> white and is clearly and prominently marked with the
> designation "1R."  As noted above, other agents and I
> have observed Wilfredo Salas enter and exit the
> **PREMISES** on numerous occasions.

Search Warrant Aff. ¶ 7.  This description of the Premises was

sufficiently specific to advise the searching agents exactly

where to search; thus, it was not "overbroad."

As for the list of items to be seized, the list was

also sufficiently specific.  The list, which was attached to the

Search Warrant itself, reads as follows:

> Items to be searched, located, and seized from the
> premises known and described as: 95-09 JAMAICA
> AVENUE, 1R, WOODHAVEN, NEW YORK, AND CLOSED
> CONTAINERS AND ITEMS CONTAINED THEREIN:
>
> 1.    Narcotics and items used in the distribution
> of narcotics, including packaging material,
> substances used to dilute (or "cut") narcotics,
> scales to weigh narcotics, and presses and other
> devices used to shape and form narcotics for
> distribution;
>
> 2.    Documents relating to or memorializing the
> distribution of narcotics, including U.S. currency
> used in the purchase and sale of narcotics, buyer
> lists, seller lists, pay-owe sheets, and records
> of sales, log books, ledgers, personal
> telephone/address books, and/or Rolodexes
> containing the names and addresses and telephone
> numbers of persons who are associated with the
> trafficking of narcotics, and computers,
> electronic devices, and electronic media on which
> the information described in this paragraph can be
> stored in electronic form;
>
> 3.    Proceeds and articles of personal property
> which are the fruits, instrumentalities, and
> evidence of the distribution of narcotics,
> including U.S. currency, negotiable instruments
> and financial instruments including stocks and
> bonds, as well as valuable collectible articles;

> 4.    Indicia of occupancy, residency, and/or
> ownership of the premises to be searched and other
> premises;
>
> 5.    Fibers, particles, and other items that may
> be subjected to chemical analysis to determine the
> presence of narcotics; and
>
> 6.    Any other items containing or reflecting
> evidence of violations of the federal law
> prohibiting the distribution of narcotics and
> conspiracy to do the same, Title 21, United States
> Code, Sections 841(a)(1) and 846.

Attachment A to Search Warrant 07-670M, United States District

Court for the Eastern District of New York, June 4, 2007 (see

Exhibit J to this Memorandum)

This list of items is "'sufficiently specific to permit

the rational exercise of judgment [by the executing officers] in

selecting what items to seize.'"  United States v. LaChance, 788

F.2d 856, 874 (2d Cir. 1986) (quoting United States v. Vargas,

621 F.2d 54, 56 (2d Cir. 1980)).  Thus, the warrant is not

"overbroad."  Accordingly, the motion to suppress the fruits of

the search should be denied.

### III. Salas's Request For A Bill Of Particulars Should Be Denied

In his counsel's Notice of Motion, Salas requests,

without argument or explanation of any kind, a bill of

particulars pursuant to Fed. R. Crim. P. 7(f).  In addition,

Salas moved pro se on December 6, 2007 for a bill of particulars

concerning the exact time frame of the conspiracy, the location

of its formation, the location of particular acts, overt acts not

54

listed in the Indictment, among other things.  <u>See</u> Salas's Pro Se
Motion For A Bill Of Particulars, December 6, 2007, at 2-3.  The
request should be denied.  Salas presently has more than
sufficient information to understand the charges against him, to
prepare a defense, to avoid unfair surprise at trial, and to
protect himself against double jeopardy.  As they are entitled to
no more, their requests for a bill of particulars should be
denied.

   **A.    Applicable Law**

      The proper scope and function of a bill of particulars
is to furnish facts supplemental to those contained in the
indictment that are necessary to apprise the defendant of the
charges against him with sufficient precision so as to enable him
to prepare his defense, to avoid unfair surprise at trial, and to
preclude a second prosecution for the same offense.  Fed. R.
Crim. P. 7(f); <u>United States</u> v. <u>Torres</u>, 901 F.2d 205, 234 (2d
Cir. 1990); <u>United States</u> v. <u>Bortnovsky</u>, 820 F.2d 572, 574 (2d
Cir. 1987); <u>United States</u> v. <u>Panza</u>, 750 F.2d 1141, 1148 (2d Cir.
1984).  "Those are the only legitimate purposes of a bill of
particulars." <u>United States</u> v. <u>Sindone</u>, 2002 WL 48604, at *1
(S.D.N.Y. Jan. 14, 2002).  "A bill of particulars should be
required only where the charges of the indictment are so general
that they do not advise defendant of the specific acts of which
he is accused." <u>Torres</u>, 901 F.2d at 234.  <u>See United States </u>v.

Earls, 2004 WL 350725, at *4 (S.D.N.Y. Feb. 25, 2004).

Accordingly, the ultimate test is whether the information sought

is necessary, not whether it is helpful.  See Earls, 2004 WL

350725, at *4; United States v. Lauerson, 1999 WL 440619, at *3

(S.D.N.Y. June 28, 1999).

If the information the defendant seeks "is provided in

the indictment or in some acceptable alternate form," such as

discovery, no bill of particulars is required.  Bortnovsky, 820

F.2d at 572; United States v. Spy Factory, 960 F. Supp. 684, 690-

91 (S.D.N.Y. 1997).  The vehicle of a bill of particulars serves

to inform a defendant of the nature of the charge, when he is

otherwise insufficiently informed, and must not to be misused to

compel disclosure of how much the Government can prove, nor to

foreclose the Government from using proof it may develop as the

trial approaches.  See United States v. Henry, 861 F. Supp. 1190,

1197 (S.D.N.Y. 1994).  "[A] bill of particulars is not a general

investigative tool, a discovery device, or a means to compel the

government to disclose evidence or witnesses to be offered prior

to trial."  United States v. Nunez, 2001 WL 91708, at *5

(S.D.N.Y. Feb. 1, 2001); accord Earls, 2004 WL 350725, at *5.  A

bill of particulars should not be used to learn evidentiary

detail, see Torres, 901 F.2d at 234, the precise manner in which

the charged crimes were committed, see United States v. Andrews,

381 F.2d 377, 377-78 (2d Cir. 1967), the manner in which the

56

Government will prove the charges, see United States v. Leonelli, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), all the overt acts in furtherance of a conspiracy, see United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), or particular acts that a particular defendant participated in, had knowledge of, or for which he is being held responsible, see United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). For example, "the government is not required to prove how or when the conspiracy was formed or how or when defendants joined the conspiracy." United States v. Pacheco, 902 F. Supp. 469, 474 (S.D.N.Y. 1995).

There are several reasons for this restricted use of a bill of particulars. First, the Government is not required to provide information tantamount to an itemized preview of its proof because of the very real danger in criminal cases that the defendants will tailor their testimony to explain away the Government's pre-disclosed case. See United States v. Cimino, 31 F.R.D. 277, 279 (S.D.N.Y. 1962). Second, detailed inquiries into the Government's case would unduly restrict the Government in presenting its proof at trial. See, e.g., Jimenez, 824 F. Supp. at 363; United States v. Goldman, 439 F. Supp. 352 (S.D.N.Y. 1977). Courts in this District have consistently held that, because a bill of particulars "confines the Government's proof to particulars furnished, requests for a bill of particulars should not be granted where the consequence would be to restrict unduly

57

the Government's ability to present its case." <u>United States</u> v. <u>Feola</u>, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).  In sum, demands for "whens" and "wheres" and "with whoms" relating to the formation of and participation in schemes and conspiracies routinely have been denied.  <u>Torres</u>, 901 F.2d at 233-34; <u>United States</u> v. <u>Colson</u>, 662 F.2d 1389, 1391 (11th Cir. 1981) (motion for bill of particulars requesting identities of unnamed co-conspirators, dates and locations of conspiratorial acts, and other detailed information properly denied); <u>United States</u> v. <u>Wilson</u>, 565 F. Supp. 1416, 1438-39 (S.D.N.Y. 1983).  If a defendant has been given adequate notice of the charges against him in the indictment or in some alternative form, the Government need not disclose additional details about the case.  <u>See</u> <u>Bortnovsky</u>, 820 F.2d at 574; <u>United States</u> v. <u>Payden</u>, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).

     In addition, the Government should not be required to provide information that would, in effect, provide the defendants before trial with a preview of the Government's case and its witnesses, with all of the attendant risks to such disclosure. "Discovery in criminal proceedings is not comparable to discovery in civil [proceedings] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury." <u>United States</u> v. <u>Malinsky</u>, 19 F.R.D. 426, 428 (S.D.N.Y. 1956).  As a court in this District

has observed,

> The stakes in a criminal case are high, and
> temptations of perjury, subornation and
> intimidation are ever present. Accordingly,
> the Government is not required to turn over
> information that will permit a defendant to
> preview the government's case and tempt him
> to tailor proof to explain it away, or see to
> it that the government's proof is not
> presented.

Sindone, 2002 WL 48604, at *1 (citing United States v. Simon, 30

F.R.D. 53, 55 (S.D.N.Y. 1962); Cimino, 31 F.R.D. 277, 279

(S.D.N.Y. 1962)).

### B. **Discussion**

In light of the clear legal principles that limit a

defendant's right to investigate the Government's proof and legal

theories before trial, Salas's request for a bill of particulars

should be denied. In discovery in this case, Salas has been

provided with, among other things, the Complaint, the Indictment,

the Kaleta and Daly Affidavits in support of wiretap

applications, periodic reports concerning the wiretaps of the

Salas Cellphone and the Casanova Cellphone, the Search Warrant

Affidavit, copies of consensually-recorded meetings and calls,

copies of intercepted calls, a memorandum stating Salas's post

arrest statement, as well as bail arguments with letters

submitted in support of Salas's detention. This material

provides Salas with detailed information relating to the conduct

with which he is charged. Accordingly, Salas's request for a

bill of particulars should be denied.

## IV.  Salas's Motion To Suppress His Post-Arrest Statement Should Be Denied

In his counsel's Notice of Motion dated May 23, 2008, Salas moves, without any explanation or argument, to suppress "any and all evidence of statements attributable to defendant allegedly made during and/or subsequent to his encounter with the police on June 4, 2007."  Notice of Motion ¶ 3.  Salas's motion should be denied.  Nowhere in his motion papers does Salas state a basis upon which to suppress any such statements.  Moreover, the Salas Affidavit contains no assertion that creates a contested issue of fact with respect to Salas's statements.

As the Court is well aware, an evidentiary hearing on a motion to suppress is required only if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact" are in question. United States v. Pena, 961 F.2d at 339.  A district court may deny a defendant's request for a hearing where the defendant's moving papers do not create a genuine dispute as to any material fact.  United States v. Caming, 968 F.2d at 236 (affirming the denial of a suppression hearing where "[t]he defense affidavits did not deny or refute the allegations" in the Government's affidavit).  Ordinarily, the disputed issue of fact must arise from affidavits that are based on personal knowledge of the facts.  United States v. Gillette, 383 F.2d 843, 848 (2d

Cir. 1967)(finding defense counsel's affidavit submitted in support of a suppression motion insufficient to raise an issue of material fact); United States v. Ahmad, 992 F. Supp. 682, 685 (S.D.N.Y. 1998) (denying hearing on motion to suppress because admissible evidence submitted by defendant, if credited, would not establish a prima facie case on the issue).

Salas does not raise any claim of fact with respect to his post-arrest statements, which were made after Salas was provided his Miranda warnings in the presence of two law enforcement officers.  Because there is no disputed issue of fact, the motion to suppress the statements should be denied.

## V.    Salas's Motion to Dismiss the Indictment As Void For Duplicity Should Be Denied

Salas contends in his *pro se* motion dated December 10, 2007 that the Indictment should be dismissed because it charges two or more offenses in a single count and is therefore void for duplicity.  The motion should be denied.  Salas is incorrect. Count One of the Indictment only charges one offense – conspiracy to distribute and possess with intent to distribute a controlled substance.  There is nothing "duplicitous" about the charge.

In any event, this motion should be denied because it was submitted in a *pro se* brief and not adopted by Salas's counsel.  Pri-har v. United States, 83 F.Supp. 2d 393, 399 n. 2 (S.D.N.Y. 2000) ("Petitioner may not pick and choose whether he is proceeding *pro se* or through counsel. Since the Court has had

61

no indication that petitioner's counsel has withdrawn from representation, any motions that petitioner wishes to file should be filed by counsel. Accordingly, petitioner's motion is denied.").

## CONCLUSION

For the foregoing reasons, Salas's pre-trial motions should be denied without a hearing.

Dated:    New York, New York
          June 23, 2008

                          Respectfully submitted,

                          MICHAEL J. GARCIA
                          United States Attorney


                    By:_____
                          David B. Massey
                          Assistant United States Attorney
                          Tel. (212) 637-2283

**DECLARATION OF SERVICE**

I, DAVID B. MASSEY, declare pursuant to 28 U.S.C. § 1746 that on June 23, 2008, I caused one copy of the Government's Memorandum of Law in Opposition to the Defendant's Pre-Trial Motion to be delivered by ECF to:

> Avrom Robin, Esq.
> Counsel for Wilfredo Salas

I declare under penalty of perjury that the foregoing is true and correct.

June 23, 2008

_____

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X

UNITED STATES OF AMERICA        :

        - v. -                   :        S1 07 Cr. 557 (JGK)

WILFREDO SALAS,                  :

            Defendant.           :

----------------------------X
```

**MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANT'S PRE-TRIAL MOTIONS**

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
Attorney for the United States
        of America

DAVID B. MASSEY
Assistant United States Attorney

    - Of Counsel -